UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

CARMEN TAFOYA,

Plaintiff-Appellant, Case No. 25-1381

vs.

CITY OF FOOUNTAIN,

Defendant-Appellee.

---

# REPLY BRIEF

---

Appeal from the order granting a motion to strike and granting summary judgment by Magistrate Judge Braswell, United States District Court Magistrate Judge for the District of Colorado, Case No. 24-cv-884-MDB

Oral argument is requested.

Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St
Denver, CO 80206
Tel: 303-319-8382
COUNSEL FOR PLAINTIFF-APPELLANT

## Table of Contents

Introduction ........................................................................ 2
Reply to the City's Facts ........................................................ 4
Reply to the City's Argument.................................................... 8
The Waiver Argument ........................................................ 8
The Trial Court Did Not Properly Apply *McDonnell Douglas* ......... 9
Plaintiff Presented Evidence of Pretext ................................. 16
The Striking of Miller's Testimony ....................................... 21
Certificate of Compliance with Rule 25.3 and Rule 32(a)(7)(B)(i)......... 22

## Table of Cases

*EEOC v. BCI Coca-Cola Co.*, 450 F.3d 476, 484 (10th Cir. 2006) ........ 10
*Murray v. UBS Securities*, 144 S.Ct. 445 (2024) ................................ 18
*Singleton v. Wulff*, 428 U.S. 106 (1976) ............................................ 9
*Tesone v. Empire Mkg Strategies*, 942 F.3d 979 (10th Cir. 2019) ......... 9

## INTRODUCTION

Plaintiff supported her facts, contrary to the City's suggestion. The City disputed many of plaintiff's facts, but that is immaterial in a motion for summary judgment where the facts are taken in the light most favorable to plaintiff. The key facts are the following:

- Plaintiff worked in the City's utilities department and was at home due to her vertigo on FMLA leave on Thursday, November 3, 2023, the day of the incident.
- Her husband had just found a tenant and plaintiff wanted to know if the tenant would have to pay a utility deposit. If he had not been a prior City customer, he would have to pay a deposit. Asking for this information would not violate City policy.

- Plaintiff could not obtain this information from home, so she called the office and eventually asked Ms. Daniel if the renter had been a prior utility customer. Ms. Daniel not only told her that the renter was a prior utility customer, but that he owed a back payment. When plaintiff returned to work the next day, plaintiff looked up the renter only to confirm that he was a prior customer.

- Plaintiff's immediate supervisor, Mr. Robinson, started the investigation of plaintiff, after talking to Dana Daniel, on grounds that plaintiff was asking for the renter's confidential information and that she was asking her co-employees to waive the renter's deposit. Neither of these assumptions was true.

- Robinson forwarded to the investigator a text message between plaintiff and Ms. Daniel, which text message showed that Ms. Daniel had something to do with disclosing the renter's past-due account. Mr. Robinson confirmed that whoever gave this information to plaintiff was violating the same confidentiality policy that was used to terminate plaintiff.

- Robinson asked that plaintiff be investigated, but did not ask the City to investigate Ms. Daniel, who was never investigated. In fact, when Debbie Miller resigned three months later, Ms. Daniel was promoted to her position.

- At the time of the incident, plaintiff was 73 years old and Ms. Daniel was 36 years old.

- The investigation determined that plaintiff had never asked her co-employees to waive the renter's deposit.

- Three people from management walked the city manager through Parker's investigation and a draft termination document. They led Mr. Trainor to believe that plaintiff accessed the renter's confidential

information and that plaintiff asked her co-employees to waive the renter's deposit,[1] neither of which were true.

## REPLY TO THE CITY'S FACTS

On page 4 of the answer brief, the City stated that plaintiff asked her co-employees "to provide information and/or take action she wanted related to a prospective renter for her family rental property, *i.e.*, for personal, non-work reasons …" Plaintiff had only asked if the renter had been a prior utility customer (Apdx 41, facts 51, 52 and 54) which the city manager said did not violate any policy. Apdx 54, fact 107. On page 5, the City states that plaintiff shared this information with her husband, but this was only that the renter had been a prior City customer. Also on page 5, in fn. 3, the City argues that plaintiff was seeking the renter's payment history. However, the two facts upon which the City relies for this statement, facts 48 and 113, say, in the light most favorable to plaintiff, that plaintiff only asked if the renter had been a prior utility customer.

This dispute arises because of the mischaracterization of what plaintiff was seeking. She said that she was only asking if the renter had been a prior utility customer, which did not violate policy. If he had not

[1] The City does not address this reason for termination at any point in its answer brief.

been a prior customer, his deposit could not be waived. On the other hand, the City represents that when plaintiff asked about the renter, she was also asking about his credit worthiness, which would violate policy.

On page 12, the City states that plaintiff incorrectly stated that Trainor gave only “two reasons [for plaintiff’s termination]: accessing the renter’s information and asking to waive the renter’s deposit.” Plaintiff lifted this from Trainor’s deposition: “Were there any other facts upon which you based the decision to terminate her besides she accessed her renter's information in the system and she asked someone to waive his - his deposit? Any other facts that you remember? No.” Apdx 435, page 19:13-18. Thus, plaintiff presented evidence that these were the two reasons for her termination. The City can change those reasons at trial but, for purposes of summary judgment, those are the reasons four termination taken in the light most favorable to plaintiff.

On page 15, the City emphasizes the following fact: Robinson was “not aware of any other employee who breached the confidentiality and other policies like Plf had.” Apdx. at 49, fact 93. This fact was supported by the following excerpt from Robinson’s deposition: “Q. Are you aware of any employee other than Ms. Tafoya who improperly accessed or –

information that she shouldn't or *provided information she shouldn't to third parties*? A. No" (emphasis added). The key difference between plaintiff and Ms. Daniel is that plaintiff provided the information that the renter had been a prior customer (not a policy violation) to her husband and son, the third parties, while Ms. Daniel only provided the information to plaintiff. However, Robinson said that whoever provided the renter's numbers to plaintiff violated City policy. Fact 120. In spite of this, Daniel was not investigated.

The City argues on page 15 of its answer brief that "at no point did Tafoya contend to the district court on summary judgment that prior to Trainor's decision, Robinson even suspected alleged misconduct by Daniel and disregarded the same." The text between plaintiff and Ms. Daniel was sent at 12:39 on November 3. Apdx 455. Robinson wrote his email to HR that plaintiff had violated policy approximately three hours later, at 3:32. Apdx 453. In his email, Robinson said, "I pulled Dana into my office to see what was going on. Carmen was told [the renter] will need to go through the deposit process.[2] She used her position and attempted to influence

[2] As stated in the opening brief, page 16, Robinson came to this conclusion before even speaking with plaintiff. Daniel told him that plaintiff was told that the renter needed to file a deposit. Hence, when Daniel sent Robinson

another employee to violate rules and regulations with transferring private account information on someone else's behalf and to circumvent her potential tenant from paying a deposit.”[3] Apdx 454, top of page.

Robinson had before him the text between plaintiff and Daniel. Fact 110. But, in spite of seeing the text message, Robinson did not open an investigation into Daniel. Robinson denies that he knew who sent the renter’s numbers to plaintiff, but, given the facts before him (he knew plaintiff had the renter’s past-due numbers; he knew of the text between plaintiff and Daniel; he knew that plaintiff could not obtain the numbers from home; from the text, he knew that plaintiff and Daniel spoke over the phone; he knew that plaintiff apologized to Daniel for sending the numbers back to Daniel, when plaintiff meant to send them to her son), only a jury may determine if his denial is believable.

---

the text message, approximately one month later, Robinson knew that Daniel knew that "they," the people in the unit, had told plaintiff that the renter needed to make a deposit. Hence, once Robinson saw the text, he knew of Daniel's involvement in telling plaintiff that the renter had back charges to pay, which information violates policy. Because asking if a customer was a prior utilities customer was not against policy, the only violation in the text message was disclosing the past-due payment.

[3] These two facts were the facts upon which Traynor based his decision to terminate.

On page 17, the City argues that Robinson said there were many ways plaintiff could have attained the information. That is not correct. Robinson said that plaintiff could have gotten the information herself. That was impossible because she could not look up the information from home and he could see from the text, that it was sent while plaintiff was at home. Her text was dated 12:39 on November 3 (Apdx 455), the day that she was at home. Robinson speculated that the renter, who would have had access to his past due account, could have told plaintiff. If that were the case, why did plaintiff go into the system when she returned to work on Friday to see if he actually was a prior customer? Fact 52. It is more likely that plaintiff received the numbers from Daniel as plaintiff said in her declaration. Apdx 456, ¶ 4.

## REPLY TO THE CITY'S ARGUMENT

### *1. The Waiver Argument*

On pages 27-31 of its answer brief, the City asserts that plaintiff waived her argument that the *McDonnell Douglas* test does not apply to a cat's paw theory because she failed to first raise it with the district court.

The City is correct.[4] Therefore, at best, this Court may review only on the plain error doctrine. **See** *Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 991 (10th Cir. 2019). **See also** *Singleton v. Wulff*, 428 U.S. 106, 121 (1976), in which the Supreme Court left the issue to the discretion of the circuit courts. Plaintiff leaves the decision as to whether this Court wants to address this issue to the discretion of this Court.

The City continues this argument in the second heading of its argument on pages 31-38 of the answer brief. Again, plaintiff leaves this to this Court's discretion.

***2. The Trial Court did not Properly Apply* McDonnell Douglas**

The City argues that the magistrate judge properly granted summary judgment under *McDonnell Douglas*. On page 40, the City argues that plaintiff waived the argument that "Robinson treated Tafoya differently than Daniel because he allegedly knew of Daniel's purported misconduct, but failed to report the same before Tafoya's employment was terminated." Plaintiff presented this argument to the court below at Apdx 419, 420, and 421.

[4] Plaintiff's counsel added this argument at the last moment and, is embarrassed to say, failed to see the implication.

The City explains its theory on pages 40-42. First, Trainor did not know of Daniel's involvement and Robinson cannot be implicated because he was not the decision-maker. Therefore, plaintiff was not similarly situated to Daniel because Trainor did not know of Daniel's involvement.[5]

Plaintiff replies as follows. Trainor did not know of Daniel's involvement because Robinson, who had the facts before him to know of Daniel's involvement (he forwarded the text message between Daniel and plaintiff to the assistant city attorney, but without any explanation to the assistant city attorney), kept it a secret. Again, Robinson was the one who started the investigation against plaintiff a few hours after plaintiff's phone call with Daniel, prior to him talking with plaintiff about the incident. **See** opening brief, page 15. The cat's paw theory was designed for facts like these – if a subordinate hides material facts from the decision-maker, that creates cat's paw liability.

"In the employment discrimination context, 'cat's paw' refers to a situation in which a biased subordinate, who lacks decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *EEOC v. BCI Coca-Cola Bottling Co*.,

[5] The two were similarly situated to Robinson, not to Traynor.

450 F.3d 476, 484 (10th Cir. 2006). The case went on to explain that when biased subordinates cause the termination, this creates cat's paw liability:

> Stripped of their metaphors, subordinate bias claims simply recognize that many companies separate the decisionmaking function from the investigation and reporting functions, and that racial bias can taint any of those functions. We see no reason to limit subordinate bias liability to situations that closely resemble the 'cat's paw,' 'rubber stamp,' 'conduit,' 'vehicle,' or other metaphors that imaginative lawyers and judges have developed to describe such claims.

*Id.* at 488.

The cat's paw theory was also created precisely because Robinson was not a decision-maker and his hiding of material facts helped cause plaintiff's termination. It was he who started the investigation into plaintiff, but did not report Daniel. That is, he treated the older employee differently than the younger employee.

On page 42, the City argues that "there is no triable issue that Daniel's alleged conduct was of comparable seriousness to Tafoya's." It was comparable. As Robinson testified, "[w]hoever gave [plaintiff] that information would be violating City policy, wouldn't she? Correct." Apdx 429, page 41:17-20. Robinson knew of the text message because he was the one who sent it to the assistant city attorney. He knew that the text was between plaintiff and Ms. Daniel. He knew that the text stated how much

the renter owed the City, confidential information according to Robinson himself. He knew that plaintiff could not have looked up the information herself from home. In short, he had all the facts necessary to know that Daniel was involved in some way in the dissemination of this confidential information.

Again, plaintiff did not argue below that Daniel should have been terminated; rather, plaintiff only argued that, if the matter was a violation of City policy and if it was serious enough to terminate plaintiff, it should have been serious enough to at least investigate Daniel. **See** plaintiff's response brief at Apdx 417-19. Therefore, the fact that Daniel shared the information with a co-employee, and not with relatives, would not mean that she should not be investigated for a potential policy violation. Unless, of course, the violation was not serious. And that is the point. To a jury, plaintiff will argue that this incident was not serious enough to elevate to a recommended termination. Remember, Trainor terminated her for asking her co-employees to waive the renter's deposit[6] and for accessing the renter's confidential information when she returned to work on Friday.

[6] Parker's investigation found that plaintiff did not ask her co-employees to waive the deposit. If true, this would appear to be the most serious

On page 43, the City again argues that plaintiff forfeited any claim that Robinson knew of Daniel's involvement. As discussed above, that is not true.

On page 46, the City argues that "Robinson's alleged knowledge of Daniel's potential misconduct is nothing more than speculative assumption impermissibly stacking inference upon inference." That is incorrect. The following are the facts given to the district court regarding Robinson's knowledge of Daniel's involvement.[7]

> "The assistant city attorney who did the investigation, Kaitlin Parker, was given the list of concerns from Connie Brisnehan [in HR]. #109, found at Apdx 55. Mr. Robinson, plaintiff's second-level supervisor, initiated the investigation. #110 From day one, Robinson said plaintiff violated policy by "circumvent[ing] her potential tenant from paying a deposit. #111
>
> "Robinson sent Parker a November 3 text message that Dana Daniel had sent to plaintiff. The text said the following: "He [the renter] needs

violation. But Trainor was never told this, a point which the City did not address in its answer brief.

[7] This is a verbatim copy from the opening brief, pages 11-14.

to go into office needs to pay bill of 220.86 and a $250.00 deposit and have them Move out your dad and put in his name… [As discussed below, plaintiff wrote this to her son but mistakenly sent it to Ms. Daniel.]"[8] #112[9]

"The context is as follows. Plaintiff wanted to find out if her husband's tenant had been a prior utility customer of the City. If so, he would not have to pay a deposit assuming he had good credit with the City. #113 Plaintiff did not know that, on the day before, November 2, the renter had already found out that he had to pay the deposit. #114 [Hence, the City's claim that plaintiff was requesting the renter's confidential information was somewhat moot because the renter already knew he had to pay the deposit and a prior balance.]

"On the day of plaintiff's call, November 3, she was at home on FMLA leave. She was not able to look up customer information from home. #115 She called Susan French and Mary Hawkins, both of whom were

[8] This bracketed sentence is in the record below.

[9] In the third column of fact 112, the City claims that "Plf has not provided evidence showing Ms. Daniel relayed the monetary amounts in Pltf's text." Defendant's statement may have been premised on defendant's motion to strike plaintiff's declaration (it was not stricken, **see** Apdx 670-71). At any rate, plaintiff explained in her declaration that she received the numbers from Daniel. Apdx 456, ¶ 4.

too busy to talk. She then called Ms. Daniel and left a voicemail. #116 At 12:39 [plaintiff] sent the above text message to Daniel asking Daniel to call plaintiff. Daniel then called plaintiff and plaintiff gave Daniel the renter's address. #117 After looking into it, Daniel called plaintiff back and told her that the renter needed to pay a deposit and the delinquent $220.86, which information plaintiff mistakenly texted back to Daniel (she meant to send text to her son). #118

"The only way that plaintiff could have obtained the delinquent-payment information on November 3 was from Daniel [or someone else in the City] because plaintiff could not look up that information from home. #119 Robinson agreed that providing this information, as Ms. Daniel did, would certainly violate the policy [the same confidentiality policy for which plaintiff was terminated]. #120 Nonetheless, the City never tasked Ms. Parker with investigating Ms. Daniel for this policy violation. #121 [As stated above in fact #112, it was Robinson who forwarded to the investigator the Daniel's text where it was revealed what the renter owed.

"Nevertheless, no one suggested an investigation of Daniel's role. In short, the subordinates jumped on the alleged impermissible disclosure

of confidential information to begin a process against the older plaintiff, while ignoring the younger Daniel's role in the same incident.] Ms. Daniel was 36 years old. #122 Before plaintiff's termination, [plaintiff] had worked 51 years in the utility department with the City. She was 72 years old at the time of her termination. She had had no discipline prior to her termination." #123

Thus, the district court was provided the necessary facts from which the court could infer that Robinson was hiding comparator information from Trainor and that Robinson escalated the matter without even discussing it with plaintiff first.

***3. Plaintiff Presented Evidence of Pretext***

On page 48, the City argues that "[t]he key element of a successful cat's paw theory of pretext is an unbroken causal chain connecting the biased employee's action to the unbiased decisionmaker's adverse decision." Again, Trainor terminated plaintiff because plaintiff looked up her renter's confidential information and because she asked co-employees to waive the deposit. Trainor was not even told of Daniel's involvement so he could not ask questions as to why he should treat plaintiff differently from Daniel. There is a factual question that the three people who walked

Trainor through the facts knew that both facts were incorrect. This is a direct link of causation between the subordinates and Trainor's decision.

Robinson initiated the matter after talking with Daniel. "I pulled Dana into my office to see what was going on. Carmen was told [the renter] will need to go through the deposit process. She used her position and attempted to influence another employee to violate rules and regulations with transferring private account information on someone else's behalf and to circumvent her potential tenant from paying a deposit." Apdx 454. He did not bother to wait to talk to plaintiff before he sent his email to HR.

Debbie Miller, plaintiff's immediate supervisor, submitted the following facts which the magistrate judge struck. Mr. Robinson, Miller's immediate supervisor, said that "I don't want someone older to be an administrative assistant for the office," when an older person (not Ms. Tafoya) applied for this open position. Apdx 440, ¶ 2.

As Ms. Tafoya's first level supervisor, Miller should have been involved in the decision to terminate her, but she was not. Miller understood that plaintiff was terminated because she looked up to see whether her husband's renter had been a prior city utility customer. That would not have caused a termination and, had Miller been told of her

termination, she would have opposed it. Instead, Miller was not told of her termination until minutes before Ms. Tafoya was terminated and Miller could do nothing about it. *Id.* ¶ 3.

Miller resigned a few months after plaintiff's termination because Miller could see that the younger employees were manipulating the supervisors against some of the older employees. Miller was going to complain of this to HR, but, before she could do so, she was put on administrative leave for "behavioral issues." After she left, Dana Daniel, who was 36 years old, took over Miller's position. *Id.* ¶ 4.

On page 49, the City argues that Parker harbored no personal discriminatory bias towards plaintiff. That is beside the point. It was the three people in management, who walked Trainor through Parker's investigation without telling him that Parker had concluded that plaintiff never asked her co-employees to waive the renter's deposit, who caused Trainor to terminate plaintiff on, perhaps, the most serious violation – asking a co-employee to waive a deposit.

The Supreme Court has recently examined the discriminatory-animus issue in a whistleblowing case, *Murray v. UBS Securities*, 144 S.Ct. 445, 453 (2024):

> Accepting the statutory construction argument "for arguments sake," as this Court did in *Bostock v. Clayton County*, 590 U.S. 644, 657, 140 S.Ct. 1731, 207 L.Ed. 218 (2020), the question is whether the word "discriminate" inherently requires retaliatory intent. It does not.
>
> * * * * *
>
> In elaborating on the meaning of "discriminate," *Bostock* made clear that a lack of "animosity" is "irrelevant" to a claim of discrimination under Title VII.

Hence, the key issue is causation, not animus. The three subordinates who walked Trainor through the investigation report caused plaintiff's termination by failing to tell Trainor that the investigation concluded that plaintiff did not ask her co-employees to waive the renter's deposit. This could hardly be accidental because it was a key fact on the most serious violation.

The City also argued on page 49 that "Tafoya's own admissions in her interview … substantiated her violations of City policy." Plaintiff only admitted that she looked up the renter to see if he had been a prior customer. Apdx 41, facts 51, 52 and 54. The city manager specifically said that this would not violate City policy.

On page 50, the City continues the argument that Parker's neutral involvement broke the causal chain. Again, that misses the point. Had Trainor been told that Parker concluded that plaintiff never asked for a waiver of the renter's deposit, combined with the fact that Robinson never

sought an investigation of Daniel's involvement,[10] this would have affected Trainor's decision.

On page 52, the City argues that Trainor did not rubberstamp any information he received from Robinson. This also misses the point. Robinson did not provide any information to Trainor. Robinson's involvement was starting the investigation, after talking to Daniel, but before getting plaintiff's story (which story he never did hear), and accusing plaintiff of the two violations upon which Trainor ultimately based his decision to terminate (asking for a waiver and looking up the renter's information), even though there was no support for either basis.

On page 53, the City argues that since Parker's investigation was neutral, this breaks the cat's paw causation. That would be true, if her total investigation were conveyed to Trainor. But, it was not and that is one of the bases for the cat's paw claim.

On page 54, fn. 32, the City argues that plaintiff mischaracterizes the role of her immediate supervisor, Debbie Miller. Trainor stated that she would have had the following role: "Q. Do you know, did Debbie Miller have

[10] This fact shows that the disclosure of the renter's information was not something that would normally cause a termination, that is, if what plaintiff did was consequential enough to cause her termination, why was Daniel, who provided the information to plaintiff, not even investigated?

any role in the decision to terminate Ms. Tafoya? A. Well, she would have been involved in the discussions and in the preparation of the corrective action form." Apdx 432, page 7:5-9. Although she signed the corrective action form, she had no part in drafting it and did not even know of it until a few minutes before she was required to sign it. **See** Apdx 440, ¶ 3.

On page 55, the City argues that because there is no evidence of Robinson having a discriminatory animus toward plaintiff, plaintiff's claim fails. As stated above in *Murray*, given the causation focus of *Bostock*, evidence of animosity is not required. Even if it is required, he treated plaintiff differently from the younger Daniel which shows his bias.

On page 56, the City argues that Robinson statement about not wanting someone older to be the administrative assistant is simply a stray comment. By itself, it would probably not be enough to show that Robinson wanted plaintiff's termination because she was too old. However, taken with the other information, it helps paint the broader picture that Robinson wanted younger workers.

***4. The Striking of Miller's Testimony***

On page 57, the City discusses the magistrate judge striking Miller's declaration. The City argues that plaintiff's initial disclosure of Miller was

perfunctory, conclusory, and vague. **See** answer brief, page 58. The City made no response to the fact that this disclosure followed the general practice in the District of Colorado as evidenced by the City's equally perfunctory, conclusory, and vague disclosures. **See** opening brief, page 41.

On page 59, the City argues that Tafoya's deposition testimony was contrary to her disclosure of Miller. This is irrelevant because this concerns the striking of plaintiff's declaration as a sham declaration (Apdx 523), which the court denied. Apdx 669-71. The City did not challenge this ruling in a cross appeal. The City had argued below that plaintiff's declaration should be stricken because her declaration was different from her deposition testimony (Apdx at 524-26), which had nothing to do with the striking of Miller's declaration testimony because her disclosure was not robust enough. Apdx 526-32.

At no point in the answer brief does the City address plaintiff's principal point that disclosures are intended to disclose the subject matter of the witness's testimony, not the facts that the witness will present at trial. **See** opening brief, pages 40-43. Given this lack of response, plaintiff has no further reply.

## CERTIFICATE OF COMPLIANCE WITH RULES 25.3 and 32(a)(7)(B)(i)

Counsel hereby certifies that all required privacy redactions have been made. This brief complies with the type-volume limitation of Fed.R.App.P. 32(a)(7)(B) because this brief contains 4775 words, inclusive of everything including footnotes.

Respectfully submitted this February 2, 2026.

By: s/ *Robert M. Liechty*
Robert M. Liechty
ROBERT M LIECHTY PC
1800 Gaylord St.
Denver, Colorado 80206
Tel: (303) 861-5300
Fax: (303) 861-2746
Email: rliechty@crossliechty.com
ATTORNEY FOR PLAINTIFF-APPELLANT

# CERTIFICATE OF SERVICE

I hereby certify that on this February 2, 2026, a true and correct copy of the above and foregoing **REPLY BRIEF** was, unless otherwise indicated, filed electronically with the Court who provides notice to the following:

Marni Nathan Kloster
Daniel Jacobs
Nathan Dumm & Mayer PC
7900 E. Union Ave., Suite 600
Denver, CO 80237-2776
mkloster@ndm-law.com
djacobs@ndm-law.com
ATTORNEYS FOR DEFENDANT-APPELLEE

*Signed Original at Office of Robert M Liechty PC*

s/ *Robert Liechty*
Robert Liechty